UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80002-CV-COHN

REVELEX CORPORATION, a Florida
corporation,

Magistrate Judge Snow

      Plaintiff,

vs.

WORLD TRAVEL HOLDINGS, INC., a Delaware
corporation and NATIONAL LEISURE GROUP, INC.
a Delaware corporation,

      Defendants.
_____/

## ORDER GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION

THIS CAUSE is before the Court upon Plaintiff's Motion for Preliminary Injunction [DE 3-2]. The Court has carefully considered the motion, response, the credibility of witnesses and argument of counsel at an evidentiary hearing on January 12, 2007, as well as the post-hearing Memoranda filed by the parties [DE 21 and 22], and is otherwise fully advised in the premises.

### I. FINDINGS OF FACT

Revelex Corporation ("Revelex" or "Plaintiff") filed this diversity action against Defendants World Travel Holdings, Inc. ("WTH") and National Leisure Group ("NLG") for breach of the confidentiality and non-compete provisions of a license agreement between Revelex and WTH, as well as claims for tortious interference under Florida law. WTH is a travel distributor selling all types of travel products, and as of July 12, 2006, owns 90% of NLG, the largest distributor of cruises in the United States. Revelex is a travel technology company that primarily licenses its proprietary online

booking software to travel companies in return for licensing fees. WTH generates revenue by sharing booking receipts with their travel provider partners earned by WTH's provision of complete service provider distribution from negotiating discounts with cruises, providing marketing support, completing the booking process both off-line and on-line, and all customer support along the way.

On October 31, 2005, Plaintiff entered into a License Agreement with WTH to provide Defendant with Plaintiff's proprietary software for travel distribution that enables travel agencies and travel suppliers to sell travel products online. Plaintiff's Exhibit 1 (hereinafter, "Agreement"). The Agreement contains confidentiality, limited-use, and non-compete provisions, as well as an arbitration provision, with an exception for certain injunctive relief remedies. While the Agreement was in force, World Travel acquired National Leisure Group ("NLG") in July, 2006.

According to the testimony of James Horvath, Chief Technology Officer for Plaintiff, in early December 2006, a World Travel website, "Cruise411.com" stopped using Plaintiff's booking engine as required by the Agreement and began using NLG's competing software booking engine. Plaintiff contends that WTH and NLG were enhancing the NLG booking engine by accessing Plaintiff's confidential, trade-secret information and then competing against Plaintiff. Plaintiff also accuses WTH of allowing NLG, a competitor to Plaintiff, access to confidential information in violation of their Agreement. Finally, Plaintiff asserts that Defendants are reverse-engineering Plaintiff's proprietary information in an attempt to gain permanent access to the proprietary information and in violation of their Agreement.

In 2005, prior to the signing of the Agreement, WTH's executives, Brad and Jeff Tolkin, met with Revelex's President and founder, David Goodis. Goodis testified that Brad Tolkin told him that WTH was not in the technology business, but believed Revelex had the technology that could become the "core" of WTH's worldwide travel booking business. Goodis was impressed with Tolkin and his vision for coupling Tolkin's travel industry success with Revelex's online travel booking engine. Goodis also testified that Tolkin indicated he may want to buy Revelex. The result of these meetings was the License Agreement.

According to Goodis and Tolkin, the License Agreement is a form of Plaintiff's regular license agreement, with some negotiated changes between Tolkin and Goodis, as well as James Horvath, Chief Technology Officer for Revelex. For example, "Customer" in the opening paragraph of the Agreement, is defined to include all "world-wide subsidiaries" of WTH, "as long as an acquisition is not in competition with Revelex." Plaintiff's Exhibit 1. In Section 4.2, language was added regarding WTH's website, "Cruise411.com." Brad Tolkin testified that WTH purchased a website portal, "cruise411.com" in July of 2005 to expand WTH's distribution capabilities, particularly for cruises booked online. At the time of the commencement of the Agreement, WTH already had other websites using other booking engines. Tolkin testified that he wanted the language in Section 4.2 to limit the Revelex engine to cruise411. He hoped in the future to only need one booking engine, but needed to get Cruise411 up and running quickly.

During 2005 and 2006, WTH considered using Revelex for all of WTH's

3

websites, following presentations by Goodis and Horvath to Tolkin and WTH.  Plaintiff's Exhibit 34.  For this reason, when WTH acquired NLG, Goodies testified that he hoped this purchase was an opportunity for Plaintiff to expand their business, not lose their business.  However, after Revelex's first presentation to WTH, but prior to the second presentation, staff from one of WTH's sites, Creative Leisure, based in Petaluma, California, expressed concern to Tolkin that Revelex could not handle all of their business in a first-class fashion.  WTH ended up attaching a separate technology product, Wincruise, to Revelex's Travel Negotiator for off-line and backoffice functions in mid-2006.  Around this time, WTH concluded that Revelex's product could not be the one booking engine for all of WTH and NLG's websites.  Tolkin did not directly let Revelex know of this conclusion,[1] nor did WTH invoke its right to terminate the agreement.[2]

On July 12, 2006, WTH closed on the acquisition of NLG.  Tolkin testified that NLG was in financial straits and it was common knowledge in the travel industry that NLG was for sale, arguing that Revelex must have known of WTH's desire to purchase

---

[1] In response to the question regarding whether WTH ever told Revelex of its in-house conclusion that Travel Negotiator, Revelex's online booking engine, would not be WTH's sole booking engine, Tolkin testified that James Horvath indirectly learned of this conclusion in a meeting set by Libra Securities, an investment firm attempting to sell Smart Travel Group, a full-service travel agency of which Revelex is a 50% owner.  Tolkin told Frank Senna of Libra, with Horvath present as Revelex's owner representative, that if Tolkin buys NLG, he won't buy Smart Travel Group.

[2] Section 15 of the Agreement provided that the term of the agreement was one year, with two automatic six month extensions, unless either party provided written notice of termination ninety (90) days prior to the end of the initial one year term or a six month renewal term.  Plaintiff's Exhibit 1.

NLG.  After the merger, during September of 2006, WTH embarked on an internal project to integrate WTH's Cruise411 website into NLG.  Plaintiff's Exhibits 6, 9, 10 and 16.  As mentioned above, Revelex did not discover this migration away from Travel Negotiator until early December of 2006.  On December 28, 2006 and January 2, 2007, Goodis engaged in telephone discussions with Brad Tolkin to determine why WTH was purportedly breaching the Agreement.

This lawsuit was then filed January 3, 2007.  The Court granted an ex-parte temporary restraining order on January 4, 2007, and held the preliminary injunction hearing on Friday, January 12, 2007.  By law, the temporary restraining order expired yesterday, Monday, January 15, 2007 (a federal holiday).

## II.  CONCLUSIONS OF LAW

Plaintiff seeks a preliminary injunction under Section 14 of the License Agreement to enjoin Defendants from using, disclosing or transmitting Plaintiff's confidential information to any third party or competitor in violation of Section 8 of the Agreement, from competing with Plaintiff in violation of Section 10, from reverse engineering in violation of Section 3, to force Defendants to use Revelex's booking engine on cruise411.com as required by Section 4.2, and to force Defendants to use Revelex's booking engine on all of Defendant's cruise websites in accordance with Section 2 of the Agreement.

In order to obtain a preliminary injunction, Plaintiff must establish the following four elements: (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3)

the threatened injury to Plaintiff outweighs the threatened harm the injunction may do to the Defendants; and (4) granting the preliminary injunction will not disserve the public interest.  Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir.1994).

### A.  Arbitration and Injunctive Relief Clauses

The Court first turns to the plain language of the parties' Agreement regarding the availability of injunctive relief.   Defendants argue that the Dispute Resolution clause in Section 16.5 precludes injunctive relief except for those sections listed in Section 14 of the Agreement.[3]  Section 16.5 states that:

> Other than those matters involving injunctive relief as a remedy, including during a pending arbitration, or any action necessary to enforce the award of the arbitrators, the provisions of this Section 16.5 shall be a complete defense to any suit, action or other proceeding instituted in any court with respect to any dispute, controversy or claim arising out of or related to this Agreement or the creation, validity, interpretation, breach or termination of this Agreement (emphasis in original).

Section 14 states that:

> In the event of any breach of threatened breach of the provisions of Sections 2, 5, 8, 13 and/or 16 hereof, each party shall be entitled to a temporary or permanent decree or order restraining and enjoining such breach or potential breach (without any bond or other security being required therefore), it being hereby expressly acknowledged and understood that damages at l

Plaintiff argues in its post-hearing memorandum that the injunctive relief provision in Section 14 merely provides those sections of the agreement for which Plaintiff need not show irreparable harm.  Defendants argue that because the "without

---

[3]  Defendant's assertion of this defense to the motion for preliminary injunction acts as a preliminary decision to invoke the arbitration clause.  Defendants actual deadline for deciding how to respond to the Complaint would be twenty (20) days from service of the Complaint, which the Court understands to be on or about January 5, 2007.

6

bond" language is placed in parentheses, this section cannot mean that it merely provides the sections for which irreparable harm need not be proven, but rather it limits injunctive relief to these five sections, period. Plaintiff is seeking such relief with regard to Sections 3, 4.2 and 10, as well as Section 2 and 8.

The key question is interpreting the phrase in Section 16.5, "other than those matters involving injunctive relief as a remedy." This phrase, taken in isolation, does not reference Section 14. However, Section 14 must inform the Court's interpretation of this phrase in Section 16.5. If Section 16.5 had stated, "In any matter involving injunctive relief as a remedy," rather than its present language, than perhaps the Court would agree with Plaintiff's interpretation. The present language must be read in conjunction with Section 14, and with the general presumption under the Federal Arbitration Act to favor arbitrability.[4] Finally, as Plaintiff's burden in this injunction proceeding is substantial likelihood it will prevail on the merits, to the extent there is a close question on contract interpretation, the Court cannot rest an injunction on concluding that Plaintiff's interpretation is correct.

Therefore, under the Agreement, injunctive relief is only available for a breach or

---

[4] The Federal Arbitration Act ("FAA") provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. However, the FAA does not "require parties to arbitrate when they have not agreed to do so." Paladino v. Avnet Computer Technologies, 134 F.3d 1054, 1057 (11th Cir. 1998) (quoting American Express Fin. Advisors, Inc. v. Makarewicz, 122 F.3d 936, 940 (11th Cir. 1997). While the FAA creates a presumption in favor of arbitrability, the courts are not to twist the language of the contract to achieve a result which is favored by federal policy. Paladino, 134 F.3d at 1057 (quoting Goldberg v. Bear, Stearns & Co., 912 F.2d 1418, 1419-20 (11th Cir. 1990)).

threatened breach of Section 2, 5, 8, 13 and/or 16. Thus, the Court's finding of Defendants now being in competition with Plaintiff cannot be remedied via a court-imposed preliminary injunction, but such claim must proceed to arbitration.[5]

### B. Confidentiality

Plaintiff has presented evidence in this action that WTH has shared the use and access to the Revelex booking engine with its new subsidiary, NLG. WTH, however, takes the position that after it acquired NLG, NLG became part of the "Customer" as defined in the preamble paragraph of the Agreement. This paragraph states in part that "World Travel Holdings, Inc. . . . and its world-side subsidiaries ("Customer"), and is effective as of the 31st day of August 2005 (the "Effective Date"), as long as an acquisition is not in competition with Revelex." As discussed above, WTH acquired NLG on July 12, 2006. If NLG is part of the "Customer" definition, then there can be no breach of the Confidentiality provisions when WTH provides information to NLG.

Plaintiff argues that NLG is "in competition" with Plaintiff and therefore is excluded from the definition of Customer. Plaintiff provided evidence that NLG and Revelex bid for similar clients prior to WTH's acquisition of NLG in July, 2006, including Mytravel.com and United Airlines' cruise booking business. Defendants assert that NLG is a large company with over 800 employees, around 50% of whom are travel agents, while Revelex merely licenses its online booking engine to travel providers.

---

[5] As discussed above in footnote 1, Defendants have not formally had to invoke their right to arbitration, though Defendants have raised the issue in opposition to the present motion. Should Defendants fail to invoke their right to compel arbitration, Plaintiff has leave to revisit this preliminary injunction issue.

Defendants also assert that Plaintiff knew seven months prior to its filing for an injunction that WTH was purchasing NLG, but never protested or terminated the Agreement.

NLG and WTH are clearly much larger and more diversified travel companies that provide more travel-related booking services than Revelex. Nonetheless, NLG does have an online travel booking engine that competes with Revelex's main product. A larger company that provides all the services a travel provider may require can certainly be in competition with a small company as to the subset of those services that the small company provides. In addition, there was no requirement in the Agreement that Plaintiff provide advance notice of a breach, other than the late December 2006 and early January 2007 telephone conversations between Tolkin and Goodis. Thus, Plaintiff has shown a substantial likelihood of success on the merits that NLG is in competition with Revelex in the online travel booking engine market.

Defendants assert that because the agreement does not define "competition," this provision is invalid under the Florida case law relating to restrictive non-compete agreements. However, this Court concludes that those cases are inapposite to this issue. WTH is not being constrained from engaging in its business as it existed at the time of commencement of the Agreement, but rather the terms of its agreement not to compete with Revelex's booking engine are being enforced. The line of cases that better govern this issue are those federal cases involving market definition and competition between different businesses. See e.g. U.S. v. Engelhard Corp., 126 F.3d 1302, 1305 (11th Cir. 1997). Since NLG has "the ability -- actual or potential -- to take

significant amounts of business away from" Revelex, the Court can easily determine that WTH, through NLG, is in competition with Revelex.  Id.

Having reached this conclusion regarding NLG's competition with Plaintiff, the Agreement is not clear as to the consequences of this conclusion.  For purposes of the Confidentiality provisions, this conclusion would mean that WTH has violated the Agreement by sharing the Travel Negotiator booking engine and the other Licensed Services in Exhibit A to the Agreement with NLG.   The record is clear that NLG has had substantial access to the use of the Travel Negotiator booking engine through the testimony of Jaime Cash, Senior Vice-President of Technology for NLG.  WTH had the opportunity to terminate the Agreement on June 1, 2006, effective August 31, 2006, prior to closing on the purchase of NLG on July 12, 2006.[6]  Thus, there is a substantial likelihood of success that WTH has violated Section 8 by providing information on the Licensed Services to a third party, in this case, NLG, given the definition of "Customer" for this Agreement.[7]

As discussed above, for a breach of Section 8 of the Agreement, Plaintiff need not show irreparable harm.  As for the threatened injury to Plaintiff versus the threatened harm an injunction may do to the Defendants, the Court will fashion an

---

[6] The Court rejects Brad Tolkin's testimony that had he thought that NLG was a competitor of Revelex, he would have exercised his right to terminate the Revelex agreement at that time.  Assuming the testimony to be true, Tolkin's conclusion regarding whether NLG competed with Plaintiff was incorrect.

[7] The Court does not agree with Goodis' testimony that this definition provided Goodis with authority to "approve" WTH's acquisitions.  Rather, the conclusion is reached based upon the plain language of the Agreement.

injunction that does not threaten Defendants' business. By having a large company such as NLG with its technology and staff, combined with the capital of WTH, the potential harm to Plaintiff of NLG's further analysis of Plaintiff's product severely threatens Plaintiff's existence in the travel industry. As for NLG and WTH, the testimony of Jaime Cash reflects that NLG is not using Plaintiff's product, having specifically rejected use of Plaintiff's products on the NLG owned or operated websites. Thus, the immediate cessation of NLG's personnel's access to Travel Negotiator would not appear to bring the ruinous consequences to WTH testified to by Tolkin. The only persons affected would be those who booked a cruise through cruise411.com prior to WTH dropping Plaintiff's booking engine for the NLG engine, and only until their booking information can be retrieved and provided to a non-NLG employee for customer service. Presumably, off-line servicing of those clients can be performed either by other WTH personnel not part of NLG, or by another service provider, whether or not Plaintiff's partner Smart Travel is used for this purpose. The Court would simply be stopping a competitor of Plaintiff to access Plaintiff's confidential information pursuant to the terms of the Agreement.

Finally, granting the preliminary injunction with regard to access to confidential information will not disserve the public interest. Any temporary disruption in servicing customers who booked a cruise with Defendants via Plaintiff's booking engine would be brief, as all parties have an interest in making sure those customers were provided effective off-line service.

### C.  Competition and Reverse Engineering

11

As discussed above, the Court has concluded that the sole remedy for alleged breach of the competition and reverse engineering sections are through arbitration. Thus, though the Court does conclude that NLG (and thus WTH) is in competition with Plaintiff, the arbitration provisions preclude injunctive relief on this breach.

As for reverse engineering, because the issue has been fully presented to the Court, the Court concludes that Plaintiff has not shown a substantial likelihood of success of its claim for reverse engineering. While Plaintiff has provided evidence of motive (competition), means (ability of Jaime Cash and NLG technology staff), and some opportunity (access and use of Plaintiff's product by NLG and gap analysis), there is no evidence that NLG has acquired Plaintiff's source code or attempted to obtain that source code. Jaime Cash provided reasonable explanations for conducting the gap analysis, and that NLG has rejecting using the extra functions provided by Plaintiff (multiple product promotions, e-leads, Corporate Group Space).

### D.  Extent of Use of Travel Negotiator: Section 2 and 4.2

Plaintiff has asserted that it believes that the Agreement requires WTH to use Travel Negotiator on the Cruise411.com website (Section 4.2) and that WTH is required to use Travel Negotiator on all of WTH's pre-NLG websites (Section 2). Taking the latter claim first, while WTH agreed "to use its best efforts to market and otherwise promote the Licensed Services," (Section 2.2) this language does not require the use of the Licensed Services on any particular website. Plaintiff asserts that the language of Section 2.1 allowing "Customer" to use other booking engines "that provide services not included in the Licensed Services" mandates use of Travel Negotiator on

all of WTH's cruise booking websites.

This reading of the Agreement does not comport with the plain meaning of the language. While it may represent plausible interpretation, Plaintiff must show a substantial likelihood of success on a violation of this subsection of the Agreement to obtain a preliminary injunction. Defendants' interpretation of this section, that WTH wanted to be able to use other booking engines that performed serviced separate from Plaintiff's products, is a reasonable interpretation. If Plaintiff intended to require WTH to exclusively use Travel Negotiator on all of WTH's websites, it should have included such a clause in the Agreement. Plaintiff has not shown a substantial likelihood of success that Sections 2.1 and 2.2 mandate such use.

Turning next to Plaintiff's claim that WTH was required to use Travel Negotiator to power the Cruise411.com website, the plain language of the Agreement does appear to require such use for that site. Defendants' argument that this requirement is only in context of License Fees does not change the plain meaning of this Section. However, as discussed above, no injunctive remedy is available for a breach of this provision. Even if one were available under the Agreement, Plaintiff has not shown irreparable harm by this particular breach, as a damage calculation based upon the license fee that would have been owed for bookings from this particular website can easily be calculated.

III.  CONCLUSION

Accordingly, it is **ORDERED and ADJUDGED** as follows:

1. Plaintiff's Motion for Preliminary Injunction [DE 3-2] is hereby **GRANTED** in part and **DENIED** in part;

2. Defendant World Travel Holdings, Inc., their subsidiaries, directors, officers, agents, escrow agents, trustees, servants, employees, attorneys, accountants and those persons acting in concern or participation with them, and each of them are hereby restrained and enjoined from:

   A.  Disclosing any of the Licensed Services (as the term is defined in the License Agreement) together with all architecture, algorithms, models, processes, techniques, user interfaces, database design and architecture, and other "know-how" embodied therein, as well as all negotiations between Customer and Licensor (as those terms are defined in the License Agreement) with respect to the Agreement, the terms, conditions and other provisions of the Agreement and any information disclosed by third parties to Licensor which is required to be kept confidential by Licensor (collectively, the "Confidential Information");

   B.  Using, disclosing or otherwise make available or allow to be used, disclosed or made available the Confidential Information of the Plaintiff by or to any third party, including National Leisure Group employees, even though National Leisure is now owned by WTH.

3. Defendants shall file a report regarding their compliance with this injunction by

January 29, 2007.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 16th day of January, 2007.

JAMES I. COHN
United States District Judge

Copies furnished to:

Daniel Newman, Esq.
Mitchell Widom, Esq.